Allen, P.
It was decided in the case of Bailey v. Poindexter, that slaves have no legal capacity to elect between freedom and slavery; and that where it appeal's to have been the intention of the testator that the manumission was to depend on the election of the slaves, the bequest was void. That case was twice argued and fully considered by the court. I entertained but little doubt from the first argument of the case, as to the correctness of the principle upon which it was determined. The supposed effect of previous *397 decisions and the alleged general impression as to the law, created the principal difficulty with me in coming to the conclusion at which the court ultimately arrived. But notwithstanding the weight of all these considerations, it seemed to me that the determination of the majority of the court was the just result to be deduced from the law and our adjudications upon the relation of master and slave in Virginia. That to confer civil capacity on slaves to make such election, was in conflict with the principles affirmed in respect to the condition of slaves in Sawney v. Carter, 6 Rand. 173; Stevenson v. Singleton, 1 Leigh 72; Rucker's adm'r v. Gilbert, 3 Leigh 8; Winn v. Carrell, 2 Gratt. 227; Smith's adm'r v. Betty, 11 Gratt. 752; and in the cases decided in other states and the Supreme court, cited in the opinion of Judge Daniel : and that to carry out the exception attempted to be created in favor of such bequests, the courts were called upon by a species of judicial legislation, to enact a distinct code of laws to regulate and determine the rights growing out of it, and to prescribe the mode of procedure. What for instance was to be the condition of those under the age of discretion ? Who was to elect for them ? What was to be the effect of such election upon their rights when arriving at full age? If the right was given to the mother, and she while electing freedom for herself, chose to elect slavery for the child, so as to cast the burden of support on the estate, would such election bind the child on attaining full age ? and what is the legal age of a slave ? These and other difficulties in the practical application of the doctrine, satisfied me of the propriety of conforming in this respect to the general rule which treats the slave as a nonentity so far as respects civil capacities; that as there can be no intermediate condition between slavery and freedom in the status of the negro, so *398 neither can there be an intermediate condition as to civil rights and capacities.
Adhering to the principle of Bailey v. Poindexter, and giving to it in all cases its legitimate effect, it becomes merely a question of construction, upon every will presenting this subject, to ascertain what in a given case was the intention of the testator. Though difficulties may arise in determining in a particular case whether it be an absolute bequest of freedom, or of an election between freedom and slavery, and different minds may come to different results, the principle is not affected thereby; that is fixed and no difficulty attends its application when the intention of the testator is ascertained. If he intended to manumit absolutely, and that intention can be fairly gathered from the terms he has used, construed with reference to the whole will, and with aid derived from the light of surrounding circumstances, so far as they can be lawfully regarded, the slaves are entitled to their freedom, unaffected by any repugnant conditions thereafter or by the same will attempted to be affixed to this absolute renunciation of property. If he did not so intend, but designed to refer the question of slavery or freedom to the choice of the slave, then he has, ignorantly perhaps, attempted to confer a capacity on the slave with which he cannot be endowed, and the bequest is void. It is not for the court to say that such a construction will defeat the benevolent intention of the testator. No one has the right to say, or can say, what would have been the disposition of the testator if he had known he could not submit the alternative to the choice of the slave.
Manumission, in the language of Stanard, Judge, in Crawford v. Moses, 10 Leigh 277, is an act by which property is renounced and extinguished. It is the exercise of a power conferred on the owner by the law, *399 with which the slave has nothing to do. The moment the deed or will, the instruments alone by which slaves can be manumitted, takes effect, he is, in legal contemplation, transformed into a new being; no property in him can exist, and he occupies the same relation to the former owner that he does to every other person in the community. The intention of the owner to sever all connection between the slave and himself or his estate, must be apparent on the face of the will. If it appears that the will contemplates a continuance of that relation in a certain contingency; that the slave, notwithstanding the provision as to his manumission, is in a certain event to remain in the condition in which he was born, to continue without change a slave of his estate, subject to the control of the representative of the estate, such an intention is inconsistent with the idea of an intention to confer absolute manumission, and tends to throw light on that portion of the will which treats of manumission. Upon the subject of intention, the rule is very clearly stated by the judge giving the opinion of the court in Wootton v. Redd's ex'or, 12 Gratt. 196: “The traces of the testator’s intention will be diligently sought out in every part of the instrument, and the whole carefully weighed together.” And in the same connection, it may be well to bear in mind the familiar remark of Pendleton, Judge, in Shermer v. Shermer, 1 Wash. 266 : “In disputes concerning wills, cases seldom elucidate the subject, which, depending on the intention of the testator, to be collected from the will, and from the relative situation of the parties, ought to be decided upon the state and circumstances of each case.” In this case, all that we know of the relative situation of the parties, is to be gathered from the face of the will and the averments contained in the bill. It is alleged, that exclusive of the negroes, the estate of the testator is estimated to be worth from fifteen thousand to *400 twenty thousand dollars; and that some of the negroes are old, and many of them, consisting of families composed of a mother and from six to eight infant children, and one an orphan, are actually chargeable.
By the first clause, the testatrix bequeathed to her daughter for life all her estate, exclusive of her negroes, after the payment of her debts, and the legacies and charges to which said estate was thereafter subjected.
No other clause of the will has any bearing upon the provisions contained in the fourth and fifth clauses, which respect the manumission of her slaves; and the first is only so far material, as it shows that the bequest to her daughter for life of all her estate, real and personal, was exclusive of her negroes.
By the fourth clause she manumits her faithful servant Charles, and directs her executors to provide him with a fund sufficient to take him to such state or country as he may elect to live in, and pay to him an annuity of one hundred dollars during his life.
Upon this clause no question has been raised; the slave is directly emancipated. As soon as the executors assented to the bequest, he was free.
The fifth clause, upon which this controversy arises, is in the following words:
Fifth. I direct in regard to the balance of my negroes that they shall be manumitted on the 1st day of January 1858. And I authorize and request my said executors to ascertain what fund will be sufficient to provide the usual outfit for, and to remove said negroes to Liberia; and I hereby direct my executors to raise said fund, or such an amount as in their judgment may- be sufficient for that purpose from my said estate, and to use the said fund in removing and settling my said servants in Liberia, or any other free state, or country, in which they may elect to live, the adults selecting for themselves, and the parents for their in *401 ffant children; and I further direct, that if any of my said servants shall prefer to remain in Virginia, instead of accepting the foregoing provisions, it is my desire that they shall be permitted by my executors to select among my relations their respective owners ; said election to be made by the adults and parents as aforesaid.
Are the slaves absolutely emancipated by this clause? or does it do more than tender to them an election to accept the provisions made for their manumission, or if they should prefer to remain in Virginia instead of accepting the foregoing provisions, to do so by remaining the slaves of her estate ?
In the previous clause the testatrix had manumitted her faithful servant Charles, and provided for his support in the country he should elect to live in. From the terms in which he is mentioned, he was no doubt a confidential servant, and from being in immediate attendance upon her, she knew his wishes, that he desired to be free; and therefore no alternative of preferring to remain in Virginia, instead of accepting the provision in his favor, is presented to him. She knew that he could only remain in Virginia as a slave : and as she was apprised of his wishes, her will conforms to them. The only reference to an election is as to the country where as a freeman he might choose to reside.
The others were not to be emancipated immediately, but át a future day, specified. In such a number, some were old, and as it appears from the bill, chargeable ; others no doubt were approaching that period of life when they could not support themselves by their labor; others may have formed connections with persons of their own condition in the neighborhood. There was therefore strong reason why, with the most benevolent feelings towards her slaves, she should not, without consulting their wishes, renounce all property in them, sever the connection between them and her *402 estate, and by the mere exercise of her legal power, kan'sh them from the place of their birth, dissolve the connecting them with others in their own condition, and cast the old and helpless, who had labored ap their past lives in her service, into a distant country, without any provision for their support. She had no doubt as to their legal capacity to choose between freedom and slavery; and from the considerations before adverted to, it is manifest to my mind she did not intend to coerce them; but to give them, after a fitting time for enquiry and consideration, the right to elect for themselves what should be their future condition. This difference of intention accounts for.the difference in the terms between the clause emancipating Charles and the clause in regard to the rest of her negroes. The whole clause must be taken together to ascertain her intention. Two alternatives were presented; one necessarily preceded the other, and the order of their position in the clause cannot vary the effect of the whole. Neither conferred absolute freedom or continued in slavery independent of the election of the slaves: and until that choice, the clause was inoperative. If before the 1st of January 1858 or on that day, the slaves or any of them, had, in the language of the decree appealed from, declined to accept the provisions of the will, would the executor have been justified in discharging them? The court below considered they were manumitted, unless they declined to accept its provisions and remain slaves. But if manumitted, they could not, by merely declining to accept, remain slaves, for the manumission, if effectual, is not dependent on their act, and the condition of slavery instantly ceased, so that they could no longer remain slaves. It is argued that her intention to give absolute freedom is apparent, because there is no bequest over. In Winn v. Carrell, there was no bequest over; and the testator was .held *403 to die intestate as to the slave. In the present case, however, even if there be no bequest over, a question not presented for adjudication, and therefore one upon which no opinion is expressed, the testatrix did contemplate and provide for such refusal to accept the provisions of the will, by treating them as remaining the slaves of her estate under the control of her executors ; for she desires that in that event they be permitted by her executors to select among her relations their respective owners.
The cases of Forward's adm'r v. Thamer, 9 Gratt. 537, and Osborne v. Taylor's adm'r, 12 Gratt. 117, are mainly relied on by the appellees, the last case especially, as being analogous to this case, and ruling it. The principle established by those eases is, that where the will actually emancipates, so that the status of the negro is changed from that of a slave to a freedman of color, all provisions imposing conditions and granting privileges, to take effect after that change of condition, are void.
In the first case the judge, in giving the opinion in which a majority concurred, remarks, “that the slave was entitled to her freedom for six months at least, the time allowed within whieh the slave was to leave the state. So if when the period of emancipation arrived the law did not. require him to leave the state, he was to be free ; or if the law did require it and he left the state, there was no forfeiture of freedom.” And therefore it was held, that as the testator had emancipated the slave, he could annex no condition subsequent to the grant of freedom.
And in Osborne v. Taylor, the judge observes, “ that it was a misapprehension of the will to construe it as directing that the slaves should remain such until they elect to become free; whereas the will in a substantive clause distinctly manumitted them; and after-wards in another clause gives them the election to re *404 main in Virginia in a condition intermediate between slavery and freedom ; an alternative against the policy of the law, and of no eifect. Whether the interpretation was correct or not, does not change the principle of the decision. But I do not entertain any doubt as to the correctness of the construction placed upon the clause of the will then under consideration. It conferred absolute freedom, with a bequest of property to them: and then a provision was inserted, amounting in fact to no more than a suggestion of a mode by which the negroes, if they preferred remaining in the state, could do so, by choosing not owners, but masters to serve during life, and at the death of the master, they were to have the option of freedom or slavery, by making a second choice. The absolute property was vested in no one j it was not contemplated that the slaves preferring to remain should remain the property of the testator’s estate. The masters to be successively chosen were to have but a limited interest. They eoold neither sell or bequeath them, but in consideration of service, were to support and protect them. This was a condition of qualified slavery, which the testator could not create, nor could the slayes do so by any election on their part. The testator intended to emancipate, to extinguish all property in them as slaves s but suggested an option, which was merely nugatory after freedom had attached.
In the present case there was no intention to emancipate without consulting the slave. The alternative of freedom or slavery was presented to the slave. Until acceptance, he remained a slave. If he declined he continued a slaye, his status never having been changed.
The cases of Pleasants v. Pleasants, Elder v. Elder, and Dawson v. Dawson, have been cited on behalf of the appellees as bearing on the construction of this will. The two first have been reviewed in the case of *405 Bailey v. Poindexter, and it is unnecessary to add any thing to what was there said, except that as to the first case the suit was brought on behalf of the negroes ; and one having arrived at thirty years of age, brought suit himself in forma pauperis. In Dawson v. Dawson's ex'or, 10 Leigh 602, the provisions of the will were almost identical with the clause of the will in the case under consideration; and if in the interpretation of that will it had been construed as conferring immediate freedom, irrespective of any election by the slave, it would have been difficult to have distinguished between the two cases. Upon the question of the capacity of slaves to elect between freedom and slavery, the case is of no authority. No such point was raised or considered. The question presented arose upon the codicil to the will, and whether the devise of the land thereby made for the support of the slaves thereon gave both land and slaves absolutely to the devisee, or created a trust for the slaves until they should be emancipated or sold. The capacity of the slaves to elect was not controverted in the pleadings or argument; but the case proceeded on the concession of such capacity and their right to freedom if they elected to take it. The court below held that the codicil did not amount to a devise of the land or bequest of the slaves thereon to the devisee as his absolute property, but created a trust for the benefit of the slaves during the period which might elapse between the testator’s death and the election of the slaves, but that the slaves were not yet freedmen, and would not be until they so elected. This court affirmed the decree deciding that the codicil created a trust for the support and maintenance of the slaves for the year within which they were to be emancipated or sold. The case can scarcely be regarded as an authority upon any of the questions raised in this case. But it serves to show that in the construction of a will almost idea *406 tical in its terms, the counsel, the court below and this court incidentally construed the will not as conferring direct ^mancipation, but the capacity to elect; the court below deciding expressly, that they were not and would not be freedmen until they so elected ; and Judge Tucker referring to emancipation not as a thing accomplished, but to be accomplished within the year when they were to be emancipated or sold, as they might elect.
It has been argued, that as the will in this case was subsequent to the act providing for the voluntary enslavement of the free negroes of the commonwealth, passed February 18th, 1856, Sess. Acts 1855-6, p. 37, the will should be construed with reference to that act; and that the testatrix may have contemplated a voluntary enslavement under that act. I think that would be a forced construction. The right conferred by that act is restricted to females who have attained the age of eighteen, and to males who have attained twenty-one years of age. If she had intended to make her slaves freedmen absolutely, she would have known if the act in question was present to her mind; that any direction was idle; as free persons, if of the proper age, they could act for themselves. And she gives to the adults and parents of infants the same right to select among her relations their respective owners as she had just before given them the right to accept or reject the provisions for their emancipation and outfit. If she had made a bequest with reference to the act of February 18th, 1856, she must be presumed to have known something of its provisions, and could not have supposed that parents would be authorized to re-enslave their infant children, or that the permission of the executor was necessary to enable a freedman to choose his master under that law.
The testatrix, it is manifest, was actuated by the most benevolent feelings towards her slaves, and the *407 intention apparent in the various provisions of the will was to make such disposition as the slaves desired. She therefore gives immediate freedom to the favored servant, because his wishes were no doubt well known to her. As to the others, not questioning their legal capacity to elect, she did not emancipate them directly. She no doubt supposed, perhaps hoped, that such as could by their labor maintain themselves, would choose freedom; and her intention was that such should be emancipated as desired to be free, and those should be slaves who preferred to remain in the state; and still looking to the welfare of her slaves, and anxious to render their condition as comfortable as she could, she desires her executors to permit such as preferred to continue in a state of slavery, to select their owners among her relations — Thus throughout consulting their wishes and intending to conform her bequest to their desires.
I think that the operation of this will as an instrument of emancipation, as in the case of Bailey v. Poindexter, is made to depend on the choice of the slaves, and therefore that the provisions of the will giving such option are void: and this is the only question necessary to be decided in the present case.
The bill was filed to get the aid and direction of the court in regard to the emancipation of the negroes. The only question decided by the court was that the slaves were emancipated by the will, unless they decline to accept its provisions and remain slaves; and as a consequence of such decision, a commissioner was directed to ascertain the election of said negroes under the provisions of the will. No question was raised by the pleadings or decided by the court as to the rights of those interested in the estate, should the fifth clause in regard to emancipation prove ineffectual. I think that the decree should be reversed, leaving open all questions respecting the rights of the parties interested *408 in the estate, to be adjudicated when a proper case made for that purpose. The slaves not being manumitted by the will, they cannot be entertained as suitors in court, and as to them the bill must be dismiSSed.
Moncure, J.
The slaves of the testatrix were among the chief, if not the chief, objects of her bounty. They constituted by far the most valuable portion of her estate. She emancipated them by her will, by words as plain as the English language affords: not precatory, but mandatory words. It was lawful for her to emancipate them. The statute declares, that “ any person may emancipate any of his slaves by last will in writing,” &c. She emancipated hers by her last will, executed according to law. Why then is the emancipation invalid? The counsel for the appellants contend that it is invalid, not because she has not emancipated her slaves in plain and mandatory terms, but because, in her anxiety to provide for their comfort and happiness, she has superadded other terms which in effect give to them an election between freedom and slavery, instead of freedom absolutely; that they are incapable of making such an election; and that therefore they must remain in slavery; according to the recent decision of this court in Bailey v. Poindexter, supra. In other words, the counsel for the appellants contend that this case is ruled by that; and so ruled, as that the slaves are neither entitled to their freedom absolutely nor to elect between freedom and slavery; while the counsel for the appellees contend that this case is like that of Osborne v. Taylor’s adndr, 12 Gratt. 117, according to which the slaves are entitled to their freedom absolutely.
I think the position of the counsel of the appellees is correct, and that this case is like that of Osborne v. Taylor. If there be any difference between the two *409 cases, I think this is stronger than that in favor of the absolute emancipation of the slaves. Let us compare the two cases. By the second, third and fourth clauses of the will in that case the testator directs certain of his slaves to be liberated, or, at their option, to remain in the state and choose masters. By the eighth clause he gave the residue of his negroes to trustees for the use of Mrs. C. M. R. Johnson during her life; and then disposed of the subject as follows : “ At the death of Mrs. C. M. R. Johnson it is my further will and direction that the slaves embraced in this item be emancipated, and one-fourth of the property which Mrs. J. may not dispose of at her death as required in item the sixth, be distributed amongst them as may be deemed most equitable by my executors. But should a part or the whole of the negroes prefer remaining in the state, they can do so by choosing masters to serve during the life of the person or persons chosen, at the death of whom they shall have the option of freedom or slavery by making a second choice.” The slaves mentioned in the second, third and fourth clauses appear to have received their freedom soon after the testator’s death. At the death of Mrs. J. a question arose as to the rights of the negroes who had been given to her for life by the eighth clause before recited. And the personal representative of the testator filed a bill to have that and other questions arising in the execution of his office determined by the court. The Circuit court held that the negroes bequeathed to Mrs. Johnson for life became entitled to their freedom at her death; and that the provision authorizing them to choose masters was void; and decreed accordingly. This court, composed of all the judges, unanimously affirmed that portion of the decree. Judge Samuels, in whose opinion on this branch of the case the other judges concurred (certainly all except Judge Daniel, who concurred in the decree of affirmance), speak *410 ing of the objection taken by the appellants, that the slaves in question were not emancipated by the will, “this objection is insisted on, because, as is alleged, the slaves were left by the will in the condition 0f slavery at the death of Mrs. Johnson, with the capacity to become free upon their election to become so ; and until the election shall be made, they remain in the condition of slavery : and we are referred to the case of Elder v. Elder's ex'or, above cited. This part of the objection is founded on a misapprehension of the will. The counsel construe the will as directing that the slaves shall remain such until they elect to become free; whereas the will, in a substantive clause, distinctly manumits them ; and afterwards, in another clause, gives them the election to remain in the state of Virginia, in a condition intermediate between slavery and freedom. The latter alternative is against the settled policy of the law, and has no effect. Forward's adm'r v. Thamer, 9 Gratt. 537. The bequest of freedom is in no wise impaired by the impracticable and repugnant alternative offered to the choice of the slaves.” That is the case of Osborne v. Taylor. And now let us look at this case.
By the first clause or item of Mrs. Coaltef’s will she gave to her daughter for life all her estate, exclusive of her negroes, after the payment of her debts and the legacies and charges to which it was therein after subjected. By the second she gave the estate so given to her daughter for life, in remainder at her daughter’s death to the children of her sister Mrs. Lacy. By the third she authorized her executors to sell any portion of her estate for the payment of said debts, legacies and charges, and also for the purpose of reinvestment. By the fourth she manumitted her servant Charles, and directed her executors to provide him with a sufficient fund to take him to such state or country as he might elect to live in, and pay to him an annuity of *411 one hundred dollars during his life. The fifth is in these words:
“ Fifth. I direct, in regard to the balance of my negroes, that they shall be manumitted on the 1st day of January 1S58. And I authorize and request my said executors to ascertain what fund will be sufficient to provide the usual outfit for and to remove said negroes to Liberia; and I hereby direct my executors to raise said fund, or such an amount as in their judgment may be sufficient for that purpose, from my said estate, and to use the said fund in removing and settling my said servants in Liberia, or any other free state or country, in which they may elect to live, the adults selecting for themselves, and the parents for their infant children. And I further direct that if any of my said servants shall prefer to remain in Virginia, instead of accepting the foregoing provisions, it is my desire that they shall be permitted by my executors to select among my relations their respective owners; said election to be made by the adults and parents as aforesaid.”
The remaining clauses are not material to be stated.
Now what is the essential difference between these two cases ? The words of manumission are at least as strong and mandatory in this case as in that. The words in that case are, “At the death of Mrs. C. M. E. J. it is my further will and direction that the slaves embraced in this item be emancipated.” The words in this case are, “I direct in regard to the balance of my negroes, that they shall be manumitted on the 1st day of January 1858.” This express and absolute manumission is immediately followed in each case by a provision, in property or money, for the emancipated slaves. And then follows a similar provision in each case in regard to their preference to remain in the state, the said provision being contained in the same item with the manumitting clause in each case ; *412 to wit, the eighth item in that, and the fifth in this case. The words of the provision in that case are, “ But should a part or the whole of the negroes prefer remaining in the state they can do so by choosing masters to serve dui'ing the life of the person or persons chosen, at the death of whom they shall have the option of freedom or slavery by making a second choice.” The words in this case are, “And I further direct, that if any of my said servants shall prefer to remain in Virginia instead of accepting the foregoing provisions, it is my desire that they shall be permitted by my executors to select among my relations their respective owners; said election to be made by the adults and parents as aforesaid.” Can the will in this case, any more than in that, be construed “ as directing that the slaves shall remain such until they elect to become free.” And may it not as well be said in this case as it was in that, “ that the will, in a substantive clause, distinctly manumits them; and afterwards, in another clause, gives them the election to remain in the state, in a condition intermediate between slavery and freedom ?” and that “ the bequest of freedom is in no wise impaired by the impracticable and repugnant alternative offered to the choice of the slaves ?” Is there any substantial difference between the nature of the alternatives offered to their choice in the two cases ? If in the one case it was, “ to remain in the state in a condition intermediate between slavery and freedom,” was it not equally so in the other ? The testator in that case obviously did not expect or intend that if they elected to remain in the state they would remain otherwise than as slaves— slaves of the person they might choose as their master during his life, and then to be free or slaves absolutely, at their election. The testator could lawfully have given his slaves to any person for life, and then to be free. And when that case was decided, it was *413 generally supposed that the testator might lawfully have given them, at the death of the life tenant, their “ option of freedom or slaveryin other words, might have made them then free, on condition that they wished to be free. The “ condition intermediate between slavery and freedom,” to which the court referred, was a state of slavery, with a right to choose masters from time to time: a right incompatible with that state to which no civil rights are incident. So in this case, the testatrix probably did not expect or intend that, if the negroes preferred to remain in the state, they would remain otherwise than as slaves— slaves of those whom they might select from among her relations, as their respective owners; “ said election to be made by the adults and parents as aforesaid.” But that right of election is incompatible with the state of slavery, and would have placed the slaves in this case as much “in a condition intermediate between slavery and freedom,” as the similar right attempted to be given to the slaves in that case would have placed them in a like condition. Certainly there is at least as much in the will in this case to indicate an intention that the emancipated slaves might remain in the state otherwise than as slaves, as there is in the will in that case. The word “ masters” in that case is just as strong to indicate a state of slavery as the word “ owners” in this. The express “ option of freedom or slavery,” given in that case, leaves no doubt of the testator’s intention; and if confirmation were required, it would be found in similar expressions occurring elsewhere in the will. No such expressions occur in the will in this case. The testatrix obviously designed that if her negroes preferred to remain in the state, they should be permitted to enjoy as much freedom as might be consistent with their so remaining. She had their comfort and welfare alone in her view, in making the provision which she did on that subject. *414 She desired that they might be permitted to select their respective owners from among her relations: supposing no doubt that they would take better care of the slaves than any other owners. She probably did not intend that the selected relations should pay any thing for the slaves selecting them. To have required that, might have defeated her purpose to give to the slaves a choice of owners. The selected relations might be unwilling or unable to pay full value for the slaves selecting them. No disposition is made of the proceeds of any sale of the slaves in the event of their preferring to remain in the state, while the slaves themselves are expressly excluded in the residuary bequest.
If it were necessary, therefore, in order to bring this case within the principle of that of Osborne v. Taylor, to show that “the alternative offered to the choice of the slaves,” is “a condition intermediate between slavery and freedom,” I think that has been fully shown : at least as much as it was shown in the case of Osborne v. Taylor itself.
But it is not necessary to do so. The principle of that case, as I understand it, at least goes to this extent, that if the will, in a substantive clause, distinctly manumits the slaves, the bequest of freedom is in no wise impaired by any impracticable and repugnant alternative, afterwards, in another clause, offered to the choice of the slaves; and if that principle goes no farther, it goes full far enough to sustain the claim of the negroes in this case to their freedom. The will of Mrs. Coalter comes up, literally, to the requisitions of the principle thus laid down in its most restricted form. But I do not understand that case as restricting the principle to a set form of words, in which alone it can be conveyed. The form of words which occurred in that case was referred to in illustration of the substantive principle on which the case was decided; *415 which principle is, that if the will distinctly manumits the slaves, the intention to manumit thus plainly expressed, is not to be frustrated by the occurrence other words in the will of equivocal import, or which, if they have any intelligible meaning at all, merely offer to the choice of the manumitted slaves some impracticable and repugnant alternative; whether it be “ a condition intermediate between slavery and freedom,” or a condition of unqualified slavery: either of which conditions is an “impracticable and repugnant alternative,” and the latter more repugnant than the former. The intention to emancipate is considered, in such case, as the paramount intent, and will prevail though the subordinate intent be unlawful. The order in which the words of the will occur is immaterial, except so far as it may serve to throw light on the question of intention. The order used in Mrs. Coalter’s will more plainly indicates a paramount intention to emancipate than any other which could be used, where the manumission is accompanied by an offer of such an alternative as is before mentioned; and being the precise order used in the will which was construed in Osborne v. Taylor, that case, it seems to me, must govern this. Otherwise, that case can have no effect at all in any other case, and has been virtually overruled by Bailey v. Poindexter. But the majority of the court in the latter case, who concurred in the decision of Osborne v. Taylor, expressly recognize it, not only in Bailey v. Poindexter, but in this case, as a still binding authority. I have therefore so regarded it in this opinion. An expression occurs in the will in this case which does not occur in the will in that, and upon which much stress was laid in the argument of the appellants’ counsel. I mean the words, “instead of accepting the foregoing provisions.” It was argued that the manumission of the slaves is one of the “ provisions” referred to; and that these words indi *416 cate an intention to give a mere election between freedom and slavery. Conceding, for the present, that the manumission of the slaves is one of the provisions referred to, the words in question are only an expression of what is implied in the will in Osborne v. Taylor. The testator did not any more expect in that case than did the testatrix in this, that the negroes could have the benefit of both alternatives. And when he said, “ But should a part or the whole of the negroes prefer remaining in the state,” the words, “instead of accepting the foregoing provisions,” or others of like import, are plainly implied.
We have seen how much this case resembles that of Osborne v. Taylor. Now compare it with Bailey v. Poindexter. The words under which emancipation was claimed in that case were, “ The negroes loaned my wife, at her death I wish to have their choice of being emancipated or sold publicly.” There are other words in the will bearing upon the question, but they all confirm the plain meaning of those I have quoted; which do not distinctly manumit the slaves, but merely give them a “choice of being emancipated or sold publicly.” There are expressions in the will in Osborne v. Taylor which bear some resemblance to these. The testator there speaks of his slaves having “the option of freedom or slavery.” But no such expressions occur in Mrs. Coalter’s will, nor any bearing the remotest resemblance to them. The principle of the case of Bailey v. Poindexter is, that where a mere election between freedom and slavery is given, as in that case, the slaves are incapable of making an election, and therefore must remain slaves. The principle of the case of Osborne v. Taylor is, that where the will in a substantive clause distinctly manumits the slaves, nothing remains to be done by them to complete their right to freedom, which will be in no wise impaired by any impracticable and repugnant alternative offered *417 elsewhere ill the will to the choice of the slaves. Under which of these two principles does this case fall ? Plainly to my miiid, under that of the case of Osborne v. Taylor.
A great deal has been said in' the argument about the proper rules for the construction of wills: As that the intention of the testator if lawful must prevail; and that to ascertain the intention, we must look to the whole will, and may transpose sentences and strike out and supply words. And the argument was practically illustrated by transposing the sentences of Mrs. Ooalter’s will, striking out and supplying words, and thus showing what was supposed to be the intention of the testatrix. By far the best rule for-construing a will is to place ourselves, as nearly as we can, in the situation of the testator when he wrote it, and then to read it precisely as it is written. Its meaning, if it have any, can almost always be thus ascertained. The application of that rule to Mrs. Coalter’s will leaves no doubt as to its meaning. It is a plain will, expressed in language and in a form perhaps as well calculated to convey the meaning of the testatrix as any that' could have been used. It was written in her last sickness and a few months only before her death. She had but one child to provide for, and that only for life; and had an ample estate, independently of her slaves, to enable her to make that provision. Her slaves, except her house servant Charles, were generally hired out for the year, and could not be emancipated before the end of the year. Under these circumstances the will was written. By the fourth clause she manumitted Charles presently; and by the fifth the balance of her negroes on the first day of the ensuing year. On that day they were to be absolutely free. The testatrix then, as she had a right-to do, renounced all dominion over them. They then became free without the necessity of any act or acceptance on their- part. *418 Indeed, they could not refuse their freedom, supposing ^ ^ave ^een given to them absolutely. The testatrix, by plain and positive words, placed them in a state °f freedom on that day; and then proceeded to direct her executors to provide the necessary funds and remove the negroes to Liberia or any other counfry in which they might elect to live. She further directed, it is true, that if any of them should prefer to remain in Virginia instead of accepting the foregoing provisions, it was her desire that they should be permitted by her executors to select among her relations their respective owners. But she surely did not intend, by this expression of what she desired in a certain event — this precatory bequest, if it may be so called — to convert an absolute, into a conditional emancipation — a positive bequest of freedom into a bequest of a mere choice between freedom and slavery. She certainly did not intend that the right of her negroes to freedom should depend on the expression of their acceptance of it, on or before the first of January 1858. They were to be absolutely free on that day, so far as she was concerned. She supposed, that though free on that day, they might thereafter lawfully remain in Virginia; and should they prefer doing so instead of accepting the provisions she had made for their removal to Liberia or some other country, she desired that they might be permitted to select owners from among her relations. She no doubt supposed that they might express their preference to remain in Virginia at any time before it became necessary for them as free negroes to remove therefrom.
It was argued that the words “instead of accepting the foregoing provisions,” embrace manumission as one of the provisions referred to; and that thus, the previous positive bequest of freedom is converted into a bequest of a mere election between freedom and slavery. These words seem only to refer to the provi *419 sions which had, immediately before and in the same sentence, been made for removing and settling the negroes in Liberia or any other country in which they might elect to live. “ If any of my said servants shall prefer to remain in Virginia instead of accepting the foregoing provisions" (that is, for their removal and settlement in some other country), “it is my desire that they shall be permitted ■ by my executors to select,” &c.; the selection, in either case, to be made by the adults and parents as aforesaid. She desires that they shall be permitted by her executors, not to elect between freedom and slavery, but to select among her relations their respective owners in case they should prefer to remain in Virginia. But if the manumission itself be one of the provisions referred to, the effect would not be as contended for. It would only show that the testatrix supposed that her servants could lawfully refuse the freedom she had previously given them ; or, at most, supposed that she could give them a right, instead of accepting it, to remain in Virginia in the manner provided, if they preferred to do so.
It was admitted in the argument, that if the testatrix intended that her slaves should be absolutely free on the 1st of January 1858, they are entitled to their freedom, notwithstanding what is said in the will about their preferring to remain in Virginia. But it was said, that it would be absurd to suppose she intended any such thing; and that it is more reasonable to suppose she intended to give them a direct election to be free, and go out of the state, or slaves, and remain in it. The same supposed absurdity existed in the will in Osborne v. Taylor, and also in Forward's adm'r v. Thamer, 9 Gratt. 537. But that did not prevent this court from construing the wills in those cases to confer freedom, with conditions subsequent annexed, which were repugnant and void. Is it reasonable to suppose that the testatrix intended to give a mere right of elec *420 tion to her slaves, which, according to Bailey v. Poindexter, would simply be a void bequest ? Is it not at least as reasonable to suppose that she intended to give them freedom, with a condition subsequent annexed? Which would she have been more likely to have done, had she been informed, when she made her will, of the law as it has been since adjudged in Bailey v. Poindexter, and of the act of February 18,1856 (Sess. Acts, p. 37), providing for the voluntary enslavement of free negroes? To construe her will as giving a mere right of election, would, according to that case, render the bequest totally' void. While to construe it as giving freedom to the slaves, with a condition subsequent annexed, would effectuate, in greater part at least, if not fully, the intention of the testatrix, not only in giving freedom to all, but in enabling.such of them as prefer to remain in the state and are of the required age, to do so, by complying with the requisitions of the act aforesaid.
We Ought to read the will as it is written, and give effect, as far as we can, to the intention thus ascertained. We ought not to be astute to find out. some other intention, for the purpose, not of effectuating, but of disappointing it. We ought to apply to bequests of freedom the same rules of construction which we apply to bequests of property. “This power of emancipation (said Judge Carr in Mann v. Given & al. 7 Leigh 689, 701), we ought not to suppose.that the legislature has dealt out grudgingly; nor ought we, when a man has resorted to the legislative means, to look with a jealous eye upon the proceeding, and hedge him round by rules and restrictions which we do not apply to other cases. The slave is his own property j the law gives him the right of emancipation; and when he has intended honestly to exercise it, without trenching upon the rights of others, we ought to extend to the instrument by which he attempted to effect *421 his intention, as much liberality at least as is shown to others disposing of property.”
I am therefore of opinion that the negroes in this case are entitled to their freedom, even conceding that the case of Bailey, v. Poindexter was rightly decided. I must say, however, that for reasons assigned in my dissenting opinion in that case, I still think it was not rightly decided; and I would now be willing to overrule it,' if it were like this case. Stare decisis, I know, is a rule of the first importance. But that case itself, in my judgment, does so much violence to the rule, that it would be more vindicated by overruling than by adhering to the case. I do not mean to say, however, that, confirmed as that case is by the opinion of the majority in this case, I may not feel myself bound by it hereafter.
Daniel and Lee, Js. concurred in the opinion of Allen. P.
Samuels, J. concurred with Moncure, J.
Decree reversed.